UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| BALLY TECHNOLOGIES, INC., | |
|     Plaintiff/Counter-Defendant, | 2:10-CV-00440-PMP-GWF |
| v. | ORDER |
| BUSINESS INTELLIGENCE SYSTEMS SOLUTIONS, INC., | |
|     Defendant/Counter-Plaintiff. | |

Presently before the Court is Plaintiff Bally Technologies, Inc.'s Motion for Partial Summary Judgment on BIS2's Eighth and Eleventh Affirmative Defenses and Seventh and Eighth Counterclaims (Doc. #136), filed on December 23, 2011. Defendant Business Intelligence Systems Solutions, Inc. filed an Opposition (Doc. #142) on January 30, 2012. Plaintiff filed a Reply (Doc. #159) on February 10, 2012.

Also before the Court is Plaintiff's Motion for Partial Summary Judgment Regarding the Issue of Patent Ownership (Doc. #137), filed December 23, 2011. Defendant filed an Opposition (Doc. #148) on January 30, 2012. Plaintiff filed a Reply (Doc. #160) on February 10, 2012.

## I. BACKGROUND

### A. Andrew Cardno

Andrew Cardno invented and filed patent applications for the technology at issue in this case while employed by Compudigm International Limited ("Compudigm"), a New Zealand corporation. (Pl.'s Mot. Partial Summ. J. Patent Ownership (Doc. #137), Ex. A ¶¶ 3, 42.) Mr. Cardno assigned some of the patent applications to Compudigm, and

Compudigm later assigned its rights in the patents to Plaintiff Bally Technologies, Inc. ("Bally"). (Id. ¶ 43.) Mr. Cardno stopped working for Compudigm in 2007. (Id. ¶ 32-33.) Bruce Rowe, Bally's senior vice president of strategy and business development, testified that Bally has "never stopped trying to clean up [the patent ownership] issues using legal or commercial avenues." (Pl.'s Mot. Prelim. Inj. (Doc. #23), Decl. Bruce Rowe ¶ 1; Def.'s Opp'n to Mot. Partial Summ. J. Defenses & Countercls., Decl. Robert W. Busby ["Busby Decl."] (Docs. #143-47), Ex. 2 at 117, 136.) In October 2008, Bally first became aware that Mr. Cardno was working for Defendant Business Intelligence Systems Solutions, Inc. ("BIS2"). (Busby Decl., Ex. 5 at 30-34.)

### B. BIS2 and Teradata

BIS2 is a data visualization software company, founded in 2008 and located in San Diego, California. (Def.'s Opp'n to Mot. Prelim. Inj. (Doc. #28), Ex. 6 ¶¶ 2, 5, Ex. 7 ¶ 3.) Originally, BIS2 was located in Las Vegas, Nevada, but in 2008, BIS2 partnered with Teradata, a data warehousing business located in San Diego, California. (Busby Decl., Ex. 1 at 18-19.) The two companies discussed developing a joint offering whereby BIS2 would design a front-end visual interface for Teradata's data warehouse. (Id. at 31-32.) Teradata provided input into BIS2's interface design. (Id. at 19-20.) The two companies planned to market the joint offering to about thirty customers, eight of which were existing Teradata customers; therefore, BIS2 anticipated acquiring thirty new customers through its partnership with Teradata. (Id. at 20, 73-74.) BIS2 relocated its office to San Diego, California to be close to Teradata. (Id. at 19.) In 2008, the two companies had regular, often daily, communications regarding their plans to go to market with the joint offering. (Id. at 27.)

In 2008, Bally also had a partnership with Teradata. (Busby Decl., Ex. 5 at 28.) In October 2008, Bally first learned of BIS2's partnership with Teradata, but Bally did not know whether BIS2 was developing "a consulting service or an actual item" or whether

BIS2's "actions were directed at or had any impact on Bally." (Busby Decl., Ex. 5 at 30-37, Ex. 8 at 14, Ex. 9 at 10.)

### C. Bally's Letters

On January 22, 2009, Mr. Rowe wrote a letter to Teradata on behalf of Bally, informing Teradata of Bally's recent acquisition of assets from Compudigm. (Pl.'s Mot. Partial Summ. J. Defenses & Countercls., Decl. Adam Yowell ["Yowell Decl."] (Doc. #136), Ex. C.) Mr. Rowe also stated:

> It has been brought to our attention that Teradata and former principals of Compudigm doing business as Business Intelligence Systems Solutions (BIS2) may currently be engaged in activities both in gaming and non-gaming markets. You should also know that there have been issues between Compudigm and all three principals of BIS2, Chairman Cees Biersma, CEO Mukesh Gordhan, and CTO Andrew Cardno. Bally's intent is to protect and prosecute any parties infringing on the rights we have acquired for gaming and to grant rights outside of gaming to those that may have a commercial interest, including Teradata. We are informing you of this because we consider our relationship with you very important. As such, I would like to speak with you to determine whether there may be some mutually beneficial opportunities between our two companies and to use our joint efforts to clear up any ambiguity regarding IP rights and ownership.

(Id.)

On the same day, Mr. Rowe wrote a letter to BIS2's chairman, Cees Biersma, stating:

> It has been brought to our attention that you may currently be undertaking activities similar to those you engaged in while you had a relationship with Compudigm in the gaming space. It was represented to us during the acquisition process that the distribution contract you had with Compudigm was terminated and that you had no possession of a saleable version of the software. We would like to confirm that this is in fact true and that none of the IP that you had possession or were exposed to is being used to create any business intelligence solutions for the gaming market.

(Busby Decl., Ex. 12.) Bally later stated in response to an interrogatory in this action that "it is not presently asserting the copying of the Compudigm source code." (Busby Decl., Ex. 8 at 9.) Mr. Rowe wrote a third letter on January 22, 2009, to Mr. Cardno, requesting a

3

meeting to clear up the patent ownership issues.  (Busby Decl., Ex. 13.)

BIS2's chief executive officer, Mukesh Gordhan, testified that in January 2009, BIS2's contacts at Teradata "suddenly all went quiet."  (Yowell Decl., Ex. A at 8, 21-23.) BIS2 did not understand why Teradata stopped communicating with BIS2 in January 2009 until Bally attached a copy of Mr. Rowe's January 22, 2009 letter to Teradata to its Motion for Preliminary Injunction in this action.  (Id. at 21-24; Pl.'s Mot. Prelim. Inj., Ex. E.)  BIS2 has tried to reconnect with Teradata without any success.  (Busby Decl., Ex. 1 at 78.)  In November 2009, ten months after writing the letter to Teradata, Bally first came to suspect that BIS2's software was infringing the patents-in-suit.  (Busby Decl., Ex. 8 at 14-15.)

### D. Aftermath of Bally's Letters

Mr. Gordhan testified that BIS2 suffered $10 million in damages as a result of the discontinuation of its partnership with Teradata.  (Bubsy Decl., Ex. 1 at 35-36.)  In particular, Mr. Gordhan testified that BIS2 spent time and money developing the Teradata partnership and lost revenue from several of Teradata's customers:  Sony, Vodafone, Seminole Tribe of Florida ("Seminole"), and Sky City Casino ("Sky City").  (Id. at 37, 39-40, 50, 82-84.)

Specifically, after Teradata went quiet, BIS2's work disappeared with Sony and Vodafone, two of Teradata's non-gaming customers.  (Id. at 83-84, 101-02.)  Neither Sony nor Vodafone mentioned that they were in discussions with Bally.  (Id. at 101-02.)  Next, although BIS2 ultimately entered into a contract with Seminole, BIS2 spent an extra year negotiating with Seminole because Seminole's IT department, namely Lyle Bell, resisted the contract.  (Id. at 39-40.)  After BIS2 announced its contract with Seminole, Mr. Bell told Bally executives "I'm not a happy camper," and Mr. Bell engaged in further discussions with Bally regarding Bally's products.  (Busby Decl. ¶ 22, Exs. 21, 22.)  Lastly, during negotiations with Sky City, the litigation between BIS2 and Bally came up and Sky City mentioned that they were in discussions with Bally.  (Busby Decl., Ex. 1 at 50-52, 54-55.)

4

1   It is unclear from the record whether BIS2 has entered into a contract with Sky City.  (See
2   id. at 52.)
3         On March 29, 2010, Bally filed suit against BIS2 for patent infringement.
4   (Compl. (Doc. #1).)  In response, BIS2 asserted abuse of process and patent misuse as
5   affirmative defenses.  (Am. Answer (Doc. #22) ¶¶ 23, 27-30.)  BIS2 also counterclaimed
6   for intentional interference with prospective economic advantage and defamation.
7   (Countercl. (Doc. #22) ¶¶ 19-30.)  Bally now moves for summary judgment on BIS2's
8   abuse of process and patent misuse affirmative defenses and BIS2's intentional interference
9   with prospective economic advantage and defamation counterclaims.

## II. LEGAL STANDARD

11        Summary judgment is appropriate "if the movant shows that there is no genuine
12  dispute as to any material fact and the movant is entitled to judgment as a matter of law."
13  Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of a suit, as
14  determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S.
15  242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable
16  fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281
17  F.3d 1054, 1061 (9th Cir. 2002).
18        The party "seeking summary judgment always bears the initial responsibility of
19  informing the district court of the basis for its motion, and identifying those portions of the
20  pleadings, depositions, answers to interrogatories, and admissions on file, together with the
21  affidavits, if any, which it believes demonstrate the absence of a genuine issue of material
22  fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quotation omitted).  The burden
23  then shifts to the non-moving party to go beyond the pleadings and set forth specific facts
24  demonstrating there is a genuine issue of material fact for trial.  Fairbank v. Wunderman
25  Cato Johnson, 212 F.3d 528, 531 (9th Cir. 2000).  Where a party fails to offer evidence
26  sufficient to establish an element essential to its case, no genuine issue of material fact can

exist, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23. The Court views all evidence in the light most favorable to the non-moving party. Cnty. of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).

## III. DISCUSSION

### A. Abuse of Process and Patent Misuse

BIS2 raised abuse of process and patent misuse as affirmative defenses to Bally's patent infringement claim. In light of the Court's Order on BIS2's Motion for Summary Judgment of No Infringement (Doc. #128), filed concurrently with this Order, the Court will deny as moot Bally's Motion for Partial Summary Judgment as to BIS2's eighth (abuse of process) and eleventh (patent misuse) affirmative defenses. See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., 92 F. Supp. 2d 483, 498-99 (E.D. Va. 2000) (denying as moot motions for summary judgment on various affirmative defenses, including patent misuse, because the court granted the defendant's motion for summary judgment of noninfringement).

### B. Intentional Interference with Prospective Economic Advantage

Bally argues BIS2 cannot prove its intentional interference counterclaim. In its Motion, Bally does not dispute that BIS2 had prospective contractual relationships with Teradata, Seminole, Sky City, Sony, or Vodafone. Nor does Bally dispute that it knew of these relationships.[1] However, Bally contends that BIS2 cannot prove Bally acted with intent to harm BIS2. Bally also asserts BIS2's only evidence of a communication with a third party regarding the dispute with BIS2 is Bally's letter to Teradata, and Bally argues this letter is privileged because Nevada law protects communications made to protect one's

---

[1] Bally argues that it did not know of BIS2's relationship with Sony or Vodafone for the first time in its Reply. The Court therefore will not consider this argument. See Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007).

own interests.  Lastly, Bally contends that BIS2 cannot prove that Bally's letter to Teradata caused Teradata to decide not to work with BIS2 nor can BIS2 prove that Bally's letter to Teradata interfered with BIS2's relationships with the other third parties.

In response to Bally's argument regarding Teradata, BIS2 argues Bally intended to interfere with BIS2's partnership with Teredata to force Mr. Cardno to resolve his lingering ownership dispute with Bally.  Next, BIS2 asserts that Bally's letter to Teradata is not privileged because Bally was not writing to protect its own interests, nor was Bally trying to establish or keep a customer.  Lastly, BIS2 offers as evidence of causation Mr. Gordhan's testimony that in January 2009 the people that BIS2 had been working with at Teradata "suddenly all went quiet."  Also, BIS2 contends when "all went quiet" between BIS2 and Teradata, BIS2 lost contracts and incurred expenses with the other third parties.

To prevail on a claim for intentional interference with prospective economic advantage, the plaintiff must prove:

> (1) a prospective contractual relationship between the plaintiff and a third party;
> (2) knowledge by the defendant of the prospective relationship;
> (3) intent to harm the plaintiff by preventing the relationship;
> (4) the absence of privilege or justification by the defendant; and
> (5) actual harm to the plaintiff as a result of the defendant's conduct.

Wichinsky v. Mosa, 847 P.2d 727, 729-30 (Nev. 1993).  The standard for causation under Nevada law is unclear.  But, Nevada adopted its test for intentional interference with prospective economic advantage from California.  See Leavitt v. Leisure Sports Incorporation, 734 P.2d 1221, 1225 (Nev. 1987) (citing Buckaloo v. Johnson, 537 P.2d 865, 872 (Cal. 1975)).  Under California law, a plaintiff must prove "damages to the plaintiff proximately caused by the acts of the defendant."  Buckaloo, 537 P.2d at 872; see also Marsh v. Anesthesia Serv. Med. Grp., Inc., 132 Cal. Rptr. 3d 660, 679-80 (Cal. Ct. App. 2011).  The defendant's conduct is the proximate cause of the plaintiff's harm if the plaintiff would have been awarded the contract but for the defendant's interference.  Korea

Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 958 (Cal. 2003).  The defendant's conduct must be a substantial factor in bringing about the plaintiff's injury.  Franklin v. Dynamic Details, Inc., 10 Cal. Rptr. 3d 429, 441 (Cal. Ct. App. 2004).

The Nevada Supreme Court's approach to causation in Wichinsky is consistent with California's proximate causation requirement.  In Wichinsky, the Nevada Supreme Court vacated the arbitrator's finding that the defendant intentionally interfered with the plaintiff's economic advantage because the plaintiff failed to prove intent, causation, and damages.  847 P.2d at 730.  The plaintiff offered evidence that the defendant contacted the plaintiff's prospective buyer and sometime thereafter the buyer reduced its offer.  Id.  But, the plaintiff admitted that the reduced offer may have been attributable to an unrelated reason, and the prospective buyer testified that it reduced its offer for unrelated reasons and the defendant did nothing to hinder the sale.  Id.  Accordingly, the Nevada Supreme Court concluded that the record did not reflect actual harm resulting from the defendant's conduct.  Id.

Assuming without deciding that BIS2 offers proof of the first four elements of its intentional interference counterclaim, BIS2 fails to offer evidence of actual harm as a result of Bally's letter to Teradata.  Specifically, BIS2 offers no evidence that Bally's letter was a substantial factor in Teradata's decision to discontinue its partnership with BIS2.  In fact, BIS2 offers no evidence at all of Teradata's decision-making process.  BIS2 could have deposed Teradata to find out why it decided to discontinue its partnership with BIS2.  Instead, BIS2 offers only Mr. Gordhan's testimony that in January 2009, BIS2's contacts at Teradata "suddenly all went quiet."  (Yowell Decl., Ex. A at 8, 21-23.)  Similarly, BIS2 offers no evidence that Bally's letter was a substantial factor in Sony's or Vodafone's decision to refrain from entering into a contract with BIS2.  The status of BIS2's contract with Sky City is unknown, and Seminole entered into a contract with BIS2.

Because BIS2 fails to offer proof of an essential element of its

counterclaim—actual harm as a result of Bally's letter to Teradata—no genuine issue of material fact remains as to BIS2's intentional interference with prospective economic advantage counterclaim. Therefore, the Court will grant Bally's Motion for Partial Summary Judgment on this issue.

### C. Defamation/Business Disparagement

Bally argues BIS2 cannot prove its defamation counterclaim. In its Motion, Bally contends that in the business context, the applicable tort is business disparagement.[2] Next, Bally asserts that its letter to Teradata does not imply that BIS2 stole source code, nor does the letter include any false statements about BIS2's products and services. Bally also argues BIS2 cannot prove the letter was unprivileged and published; intent, knowledge of falsity, or reckless disregard for the truth; or that the letter proximately caused harm to BIS2.

BIS2 responds that Bally's letters to Teradata, Mr. Biersma, and Mr. Cardno constitute false and disparaging statements because Bally accused BIS2 of stealing source code and infringing on its patents. BIS2 offers as evidence of falsity and malice Bally's admission that it had no reason to suspect BIS2 was infringing at the time it wrote the letter and Bally's decision to drop its stolen source code accusations. Next, BIS2 argues the letters were unprivileged and published. Lastly, BIS2 contends the letters proximately caused harm to BIS2 in the form of about $10 million in damages because Teradata suddenly went quiet after receiving Bally's letter.

To prevail on a business disparagement claim, a plaintiff must prove: "(1) a false and disparaging statement, (2) the unprivileged publication by the defendant, (3) malice, and (4) special damages." Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc., 213 P.3d

---

[2] BIS2 does not dispute Bally's characterization of its defamation counterclaim as a business disparagement counterclaim, nor does BIS2 dispute the standard that should apply. As such, the Court will treat this counterclaim as a business disparagement counterclaim.

496, 504 (Nev. 2009). Publication is the communication of a statement to a third party. M & R Inv. Co. v. Mandarino, 748 P.2d 488, 491 (Nev. 1987).

Additionally, a plaintiff must prove special damages by establishing that the defendant's disparaging statement proximately caused the plaintiff's economic loss. Id. at 505. The plaintiff can do so by showing "the loss of specific sales attributable to the disparaging statement" or a general decline in business. Id. The loss of a specific sale is attributable to the disparaging statement if the statement was a "substantial factor in determining the conduct of third persons which brings about the loss." Restatement (Second) Torts § 632; see also Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 767 (Tex. 1987) ("[T]he communication must play a substantial part in inducing others not to deal with the plaintiff."). A customer may consider a number of factors in deciding whether to break a contract or refrain from entering into a contract. Restatement (Second) Torts § 632 cmt. c. "If, however, the publication of the disparaging matter is one of the considerations that has substantial weight, the publication of the disparaging matter is a substantial factor in preventing the sale and thus bringing financial loss upon the owner of the thing in question." Id.

Time and money spent counteracting a disparaging statement cannot satisfy the special damages element of a business disparagement claim. Advanced Training Sys. v. Caswell Equip. Co., 352 N.W.2d 1, 7-8 (Minn. 1984) (cited by Virtual Educ. Software, Inc., 213 P.3d at 505). "Efforts to mitigate damages in tort are not compensable unless plaintiff proves a tort, and where special damages are an essential element of plaintiff's action, they must be proved before mitigation expenses may be considered." Id. at 8.

///
///
///
///

Assuming without deciding that BIS2 offers proof of the first three elements of its business disparagement counterclaim, BIS2 fails to offer evidence of special damages proximately caused by Bally's letter to Teradata.[3]  As discussed above, BIS2 offers no evidence that Bally's letter was a substantial factor in Teradata's decision to discontinue its partnership with BIS2, nor does BIS2 offer evidence that Bally's letter was a substantial factor in Sony's or and Vodafone's decision to refrain from entering into a contract with BIS2.  The status of BIS2's contract with Sky City is unknown, and Seminole entered into a contract with BIS2.  To the extent BIS2 argues its special damages include the time and money spent counteracting Bally's letter to Teradata, such losses cannot satisfy the special damages element of BIS2's business disparagement counterclaim.  BIS2 first must establish every element of its business disparagement counterclaim, and then BIS2 may present evidence of its efforts to mitigate damages.

Because BIS2 fails to offer proof of an essential element of its counterclaim—special damages proximately caused by Bally's letter to Teradata—no genuine issue of material fact remains as to BIS2's business disparagement counterclaim. Therefore, the Court will grant Bally's Motion for Partial Summary Judgment as to BIS2's defamation (business disparagement) counterclaim.

### D. Patent Ownership

BIS2 moves for partial summary judgment on the issue of patent ownership. Bally argues no genuine issues of material fact remain as to patent ownership because the doctrines of claim preclusion and law of the case apply.  BIS2 responds to Bally's claim preclusion and law of the case arguments, but BIS2 also argues that Bally's Motion for

---

[3] Bally published the allegedly false and disparaging statements about BIS2 by sending its letter to Teradata, a third party.  Because BIS2 does not offer evidence that Bally's letters to BIS2 executives, Mr. Biersma and Mr. Cardno, were sent to a third party, the only publication at issue in this action is Bally's letter to Teradata.

Partial Summary Judgment is really a motion in limine to preclude the admission of evidence regarding the ownership dispute at trial.  BIS2 contends that the facts surrounding the ownership dispute between Bally and Mr. Cardno are relevant to several claims, defenses, and counterclaims.

In light of the Court's rulings in this Order and the Court's Order filed concurrently with this Order, no claims, defenses, or counterclaims remain in dispute. Therefore, the Court will deny as moot Bally's Motion for Partial Summary Judgment Regarding the Issue of Patent Ownership.

**IV. CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff Bally Technologies, Inc.'s Motion for Partial Summary Judgment on BIS2's Eighth and Eleventh Affirmative Defenses and Seventh and Eighth Counterclaims (Doc. #136) is hereby GRANTED in part and DENIED in part.  The Motion is granted as to Defendant Business Intelligence Systems Solutions, Inc.'s seventh (intentional interference with prospective economic advantage) and eighth (defamation) counterclaims.  The Motion is denied as moot as to Defendant's eighth (abuse of process) and eleventh (patent misuse) affirmative defenses.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment Regarding the Issue of Patent Ownership (Doc. #137) is hereby DENIED as moot.

DATED:  August 23, 2012

_____
PHILIP M. PRO
United States District Judge